

ORIGINAL

1  Thomas R. Malcolm (State Bar No. 039248)
   trmalcolm@jonesday.com
2  John A. Vogt (State Bar No. 198677)
   javogt@jonesday.com
3  JONES DAY
   3 Park Plaza, Suite 1100
4  Irvine, California  92614
   Telephone:  (949) 851-3939
5  Facsimile:   (949) 553-7539

6  Attorneys for Plaintiffs
   5TH AVENUE PARTNERS, LLC, STEVE
7  REBEIL, AND TOM BENJAMIN

8          THE UNITED STATES DISTRICT COURT

9       FOR THE SOUTHERN DISTRICT OF CALIFORNIA

10

11  5TH AVENUE PARTNERS, LLC, a
    California Limited Liability Company,       CASE NO. 08 CV 0118 BTM BLM
12  STEVE REBEIL, an individual,
    TOM BENJAMIN, an individual,               COMPLAINT FOR BREACH OF
13                                             CONTRACT, BREACH OF THE
                Plaintiffs,                    COVENANT OF GOOD FAITH
14                                             AND FAIR DEALING, AND
          v.                                   DECLARATORY AND
15                                             INJUNCTIVE RELIEF
    THE SETAI GROUP, LLC, a New
16  York Limited Liability Company,            DEMAND FOR JURY TRIAL
    JONATHAN BREENE, an individual,
17  JOHN CONROY, an individual, and
    DOES 1-10,
18
                Defendants.
19

20

21

22

23

24

25

26

27

28

LAI-2926610v1

1    Plaintiffs, 5th Avenue Partners, LLC ("Fifth Avenue"), Steve Reibel

2  ("Rebeil"), and Tom Benjamin ("Benjamin") (collectively, "Plaintiffs" or "Fifth

3  Avenue") file this Complaint against Defendants, The Setai Group, LLC ("Setai"),

4  Jonathan Breene ("Breene"), John Conroy ("Conroy"), and DOES 1-10

5  (collectively, "Defendants" or "The Setai Group"), and demanding a trial by jury,

6  allege as follows:

7                          **JURISDICTION AND VENUE**

8        1.    This Court has original jurisdiction over this matter under 28 U.S.C.

9  § 1332, in that it is a civil action between citizens of different states in which the

10 matter in controversy exceeds, exclusive of costs and interest, seventy-five

11 thousand ($75,000.00) dollars.

12       2.    Upon information and belief, venue is proper in the Southern District

13 of California, under 28 U.S.C. § 1391(a), in that all of the defendants are subject to

14 personal jurisdiction in this District at the time the action is commenced and a

15 substantial part of the events or omissions on which the claims in this matter are

16 based occurred in this District.

17       3.    Venue and jurisdiction are proper in the State of California because

18 this proceeding relates to a contract between Plaintiffs and Defendants, which:

19 (i) contains a forum selection clause; and (ii) provides that "venue of all

20 proceedings relating to this Letter of Intent shall be in the State of California." (See

21 Exhibit 1, hereto.)

22                              **THE PARTIES**

23       4.    Fifth Avenue is a Limited Liability Company formed under the laws of

24 the State of California and has its principal place of business at 23 Corporate Plaza,

25 Suite 242, Newport Beach, California 92663.  The members of Fifth Avenue are

26 Rebeil, Benjamin, Jorge Burtin ("Burtin") and Derek Clark ("Clark") (and no

27 others).  Burtin is a member of Fifth Avenue, is a citizen of the United States, and is

28 a resident of, and domiciled in, the State of California.  Clark is a member of Fifth

LAI-2926610v1

1   Avenue, is a citizen of the United States, and is a resident of, and domiciled in, the

2   State of California. All of the members of Fifth Avenue are: (i) citizens of the

3   United States; and (ii) domiciled in the State of California.

4          5.    Rebeil is a member of Fifth Avenue, is a citizen of the United States,

5   and is a resident of, and domiciled in, the State of California.

6          6.    Benjamin is a member of Fifth Avenue, is a citizen of the United

7   States, and is a resident of, and domiciled in, the State of California.

8          7.    Upon information and belief, Setai is a Limited Liability Company

9   formed under the laws of the State of New York. Setai regularly does business in

10  the State of California, including entering a contract with Plaintiffs, which: (i) is

11  the subject of this dispute; and (ii) contains a forum selection clause that provides

12  that "venue of all proceedings relating to this Letter of Intent shall be in the State of

13  California." (See Exhibit 1.) The members of Setai are Breene and Conroy (and no

14  others). Upon information and belief, all of the members of Setai are citizens of the

15  United States. None of the members of Setai are domiciled in the State of

16  California. Breene and Conroy are the principals, controlling members, and alter

17  egos of Setai. Setai holds itself out as the owner of the "Setai" brand name.

18         8.    Upon information and belief, Breene is: (i) a principal, controlling

19  member, and alter ego of Setai; (ii) is a citizen of the United States; and (iii) a

20  resident of, and domiciled in, the State of Florida. Breene regularly does business

21  in the State of California, including entering a contract with Plaintiffs, which: (i) is

22  the subject of this dispute; and (ii) contains a forum selection clause that provides

23  that "venue of all proceedings relating to this Letter of Intent shall be in the State of

24  California." (See Exhibit 1.) Breene holds himself out as an owner of the "Setai"

25  brand name.

26         9.    Upon information and belief, Conroy is: (i) a principal, controlling

27  member, and alter ego of Setai; (ii) is a citizen of the United States; and (iii) a

28  resident of, and domiciled in, the State of New York. Conroy regularly does

LAI-2926610v1

3

1    business in the State of California, including entering a contract with Plaintiffs,

2    which: (i) is the subject of this dispute; and (ii) contains a forum selection clause

3    that provides that "venue of all proceedings relating to this Letter of Intent shall be

4    in the State of California." (See Exhibit 1.) Conroy holds himself out as an owner

5    of the "Setai" brand name.

6        10.   Plaintiffs are ignorant of the true names and capacities of the

7    defendants sued herein under the fictitious names DOES 1-10, inclusive (the "Doe

8    Defendants"). Upon information and belief, the Doe Defendants are involved with

9    The Setai Group and/or the activities alleged herein, but Plaintiffs have been unable

10   to identify the names of the Doe Defendants from available public records.

11   Plaintiffs have thus sued the Doe Defendants by their fictitious names. Plaintiffs

12   will seek leave to amend this Complaint to allege the true names, capacities, and

13   residences of the Doe Defendants when ascertained.

14       11.   Plaintiffs are informed and believe, and thereupon allege, that the Doe

15   Defendants, and each of them, are responsible in some manner, by their acts and/or

16   omissions, for the matters alleged herein.

17                          **FACTUAL BACKGROUND**

18       12.   In the Spring of 2007, The Setai Group — which fashions themselves

19   as creators of style and the owners of the "Setai" brand name — was introduced to

20   Fifth Avenue for the purpose of exploring a business relationship to sell, market,

21   develop and/or operate luxury hotels under the "Setai" brand in the western United

22   States, Hawaii and Mexico.

23       13.   On or about May 7, 2007, Breene flew to California to meet with the

24   principals of Fifth Avenue, Rebeil and Benjamin. After meeting the principals of

25   Fifth Avenue in California, Breene wrote to Rebeil and Benjamin (on or about

26   May 13, 2007) advising them that "it was very nice to meet you both" [and] "[w]e

27   walked around the building [i.e., the Diegan hotel, which Fifth Avenue owns and

28   which is located in San Diego, California] today and it definitely has the possibility

LAI-2926610v1

1    of becoming a great ["Setai"] hotel and residential project." That communication

2    concluded with Breene noting to Fifth Avenue:   "I look forward to further

3    discussing how we can walk together. I will be in touch next week." During the

4    negotiations with Fifth Avenue, The Setai Group represented to Fifth Avenue that

5    The Setai Group owned the "Setai" brand name and legally would be able to

6    contribute that brand name to the parties' hotel business venture.  Fifth Avenue

7    reasonably relied upon that representation in entering into a contract (discussed

8    below) with The Setai Group.

9        14.    On or about May 14, 2007, The Setai Group and Fifth Avenue

10   principals had a conference call during which various deal items were discussed

11   regarding the parties' hotel business venture, including a hotel in San Diego.  That

12   phone conversation is noted in a written communication from Benjamin to Breene,

13   dated on or about May 15, 2007, wherein Benjamin sent Breene a draft of proposed

14   business structure deal points that the parties had discussed:

15                Nice speaking with you today.  Attached find our

16                proposed business structure deal points which we think

17                were all discussed during our phone call.  Following your

18                review please call us to discuss your comments and any

19                points (sic) deal points that we may have missed.  Call

20                either of our cell phones as we will be in San Diego

21                all day.

22       15.    In response to that communication from Benjamin, Breene notified

23   Fifth Avenue, in writing, that The Setai Group was "on board" with the deal, but

24   had "some minor comments" to the Fifth Avenue-proposed deal points (which

25   Breene ultimately listed in a separate written communication).   In the closing

26   paragraph of his communication, Breene advised Fifth Avenue that "[w]e [The

27   Setai Group] look forward to putting together a binding letter of intent."

28

LAI-2926610v1

16.   Over approximately the next seven days, the parties continued their negotiations on the "binding letter of intent." The drafting and redlining of that contract was handled by attorney Tara Gorman ("Gorman"), with the law firm, Greenberg Traurig, in Washington, D.C. On or about May 22, 2007, Breene wrote several e-mails to Fifth Avenue and Gorman concerning the negotiations and drafting of the "binding letter of intent":

- "I just dropped [cell phone call], please continue to discuss with John [Conroy] as we both are in agreement on how to proceed. I will keep trying to call in."

- "Sorry guys that I kept dropping [my cell phone calls]. I will follow up with John [Conroy] to go thru everything. I look forward to finalizing the deal so we can start working."

17.   For his part, Conroy (on or about May 22, 2007) expressed the same sentiments as his partner, Breene, regarding the deal with Fifth Avenue:

Tom and Steve,

Hopefully we sign as soon as tomorrow and officially become partners.

Jonathan and I are excited about hooking up with you guys. I think our team is incredibly strong and I believe together we can grow Setai into a powerhouse five star brand that will go toe to toe with the best hotels in the world.

Can't wait to get going.

18.   The parties *got going* the very next day. On May 23, 2007, Fifth Avenue entered a contract with The Setai Group, entitled "Letter of Intent— Setai West" (hereinafter, the "*LOI—Setai West*"). By its terms, the *LOI—Setai West* is a fully executed and "legally binding" contract, which consists of a Letter

1    and an attached Term Sheet.  A true and correct copy of the fully executed *LOI—*
2    *Setai West* contract is attached as Exhibit 1 to this Complaint.

3        19.    As the *LOI—Setai West* contract reflects, Fifth Avenue and The Setai
4    Group entered the *LOI—Setai West* to, *inter alia*, sell, market, develop and/or
5    operate luxury hotels under the "Setai" brand in the western United States, Hawaii
6    and Mexico.  The principal reason why Fifth Avenue entered this contract with The
7    Setai Group was to be able to use the "Setai" brand name which, again, The Setai
8    Group represented it owned.

9        20.    Upon receiving his copy of the *LOI—Setai West*,  Conroy wrote to
10    Fifth Avenue and Gorman to advise them as follows:    "That's great.
11    Congratulations everyone.  We should set up a conference call to discuss the next
12    steps for San Diego."  Conroy's exuberance at the time is understandable:  Under
13    the *LOI—Setai West*, Fifth Avenue was bringing — and did, in fact, bring — to the
14    deal its money (literally tens of millions of dollars to date) and its ability to raise
15    even more money for the projects, its hotel properties and projects, and its expertise
16    in hotel development.  The Setai Group, on the other hand, brought no money to the
17    deal; instead, as discussed below, The Setai Group contributed the brand name
18    "Setai" to the parties' deal.

19        21.    To elaborate, the *LOI—Setai West* recognizes "that each party [Fifth
20    Avenue and The Setai Group] has unique and specialized skills to contribute to the
21    JV."  (See Exhibit 1.)  Under the *LOI—Setai West* contract, Fifth Avenue is to
22    contribute:  (i) its expertise in hotel development; (ii) its ability to raise capital for
23    the ["Setai" hotel] Projects; (iii) a hotel owned by Fifth Avenue in San Diego,
24    California, known as the "Diegan," which (per the parties' contract) will be called
25    the **"Setai San Diego"**; (iv) a hotel project located at 8484 Wilshire Boulevard,
26    Beverly Hills, California, which (per the parties' contract) will be called the
27    **"Setai Beverly Hills"**; and (v) a hotel project site located in San Francisco,
28    California. (See Exhibit 1.)  With regard to The Setai Group, the *LOI—Setai West*

LAI-2926610v1

contract provides, and contractually requires, The Setai Group to "contribute the Brand [defined under the contract as "Setai"] and its [claimed] expertise in design and management of luxury hotels." (Id.) Under the *LOI—Setai West* contract, Fifth Avenue retains 100% ownership of the "Setai San Diego" and the "Setai Beverly Hills" hotels.

22.   By its express terms, the *LOI—Setai West* contract provides that, upon its execution, that contract "shall be binding and enforceable" on The Setai Group and Fifth Avenue. (See Exhibit 1.) As discussed below, the parties' course of dealing under that contract independently establishes that the *LOI—Setai West* is a binding and enforceable contract upon the parties.

23.   The *LOI—Setai West* contract also provides that the parties "shall enter negotiations with the intention being to agree on and enter into" additional contractual agreements to govern their business relationship — so long as those additional agreements "include the terms set forth in the Term Sheet [which is part of the *LOI—Setai West* contract] and such other terms as agreed to by the parties that are consistent with [the *LOI—Setai West* contract]." (Exhibit 1.) Per the express terms of the *LOI—Setai West* contract, if the parties are unable to come to an agreement on further contracts to govern their business relationship, the *LOI—Setai West* contract "shall remain in effect" and govern the parties contractual relationship. (Id.)

24.   Under the *LOI—Setai West* contract, Fifth Avenue was obligated, "[a]s soon as reasonably practical" following the execution of the *LOI—Setai West* contract, to provide The Setai Group with "initial drafts" of additional agreements "incorporating the terms set forth in the Term Sheet." (Exhibit 1.) Although Fifth Avenue promptly provided The Setai Group with those drafts — which The Setai Group edited, had redlined, and ultimately agreed to — The Setai Group, in bad faith and without justification, did not execute any of those additional agreements.

1   Accordingly, the *LOI—Setai West* contract, and their course of dealing, continues to

2   control the parties' contractual relationship.

3        25.   The express provisions of the *LOI—Setai West* contract, and the course

4   of dealing and intentions of the parties in entering into that contract, granted Fifth

5   Avenue the right to use the "Setai" brand in connection with sale, marketing,

6   development and/or operation luxury hotels in the western United States, Hawaii

7   and Mexico, which included, but was not limited to: (i) the Diegan Hotel (which,

8   per the *LOI—Setai West* contract, shall be known as the "**Setai San Diego**"); and

9   (ii) the hotel project located at 8484 Wilshire Boulevard, Beverly Hills, California

10   (which, per the *LOI—Setai West* contract, shall be known as the "**Setai**

11   **Beverly Hills**"). (Id.)

12        26.   Consistent with the terms of the contract, the parties' course of

13   dealing, and intentions in entering into that deal, shortly after executing the *LOI—*

14   *Setai West* contract, the parties began work on turning the Diegan hotel into the

15   "Setai San Diego" — the first hotel project scheduled to open per the *LOI—Setai*

16   *West* contract. That is, Fifth Avenue spent substantial sums of money in San Diego

17   turning the "Diegan" into a "Setai" hotel. The Setai Group knew that Fifth Avenue

18   was spending considerable time and money on the parties' hotel projects (such as

19   the "**Setai San Diego**"), directed Fifth Avenue to spend that money, and repeatedly

20   acknowledged that this and other hotel projects were moving forward per the

21   parties' contract.

22        27.   For example, on or about June 6, 2007, Breene wrote Benjamin to

23   advise him of the work Breene and his team were doing on the advertising and

24   promotion for the "Setai San Diego" project:

25         **Subject: The Setai, San Diego**

26         Tom,

27           I had a meeting yesterday with Nancy Di Bernardo

28         (Setai Sales & Marketing Director) and Sean Grimes from

1    Pace Advertising to go over the San Diego project. I told
2    them to talk directly with you in regards to any
3    information they need.
4        We feel that we have enough Setai Club books in
5    stock that we could reuse to save time and money. They
6    need as much images etc to start putting a brochure
7    together.
8  That same day, Breene wrote to Fifth Avenue to advise that "I [Breene] think we
9  will have a lot of fun and do very well working together on Setai project." In that
10 same written communication, Breene also advised the Fifth Avenue principals that:
11       We will continue to work through Tom's
12       [Benjamin's] check list on the San Diego project. We
13       should be able to move things along after our guys meet
14       you next week. We had a meeting with Pace in NY and
15       are moving on the sales and marketing materials.
16           Is there anything we need to do in regards to the
17       Beverly Hills project? I need to know the timing so I can
18       brief some of our consultants not to bill too high on San
19       Diego as we will do Beverly Hills with them (ie.
20       Denniston) [The Setai Group's interior designer].
21    28.   As Breene's communications note, The Setai Group was hand-
22 selecting the interior designer for the "Setai San Diego" and the "Setai Beverly
23 Hills" projects — which is consistent with The Setai Group's contractual obligation
24 under the *LOI—Setai West* contract. As set forth below, however, The Setai Group,
25 and its designers, breached the *LOI—Setai West* contract by unreasonably delaying
26 the opening of the parties' hotels, including the "Setai San Diego" in particular,
27 which has damaged Fifth Avenue on the order of multi-millions of dollars.
28

LAI-2926610v1

10

29.   To elaborate, two days after The Setai Group had arranged to have the Fifth Avenue principals meet with The Setai Group's hand-selected designer, the designer failed to show up for that meeting — notwithstanding the fact that Fifth Avenue paid for the designer's hotel rooms for this meeting and paid for the designer's other arrangements.

30.   On or about June 8, 2007, Fifth Avenue informed Breene that "Denniston [The Setai Group's designer] 'NO SHOWED'" for the meeting. Breene responded that same day as follows: "I can't believe they didn't show up. Maybe it's time we start looking for another interior designer.  I have already sent them [Denniston] a fuc_ you (expletive deleted) email asking them to explain."

31.   About one month later — and, despite the fact that the "Setai San Deigo" was supposed to open its doors in December of 2007 — Breene advised Fifth Avenue that he did not know whether The Setai Group's interior designers could deliver on time: "To be honest, I don't know if they can deliver on time.  I think this is going to be way too quick for them."  Breene also advised Fifth Avenue that: (i) not using that designer was "no big deal" because he [Breene] did not "need people on the team saying it can't be done"; and (ii) he was going to meet with a different designer for the "Setai San Diego":

> I spoke to Paul and he feels very uncomfortable with the timetable he has and doesn't really want to take on the project.  No big deal as Paul was being way too negative which was starting to piss me off.  I don't need people on the team saying it can't be done.
>
> I am going to coordinate with Tui Pranich who is working with us on a number of Setai projects.  He is a very good Asian designer and is really positive.  We have already discussed the project in detail and I feel that between him, Ted [Wright] and myself, we will come up

with an amazing design that works for the hotel in the
timetable you have.

If we have $30,000 per typical room for
FF&E/OS&E (larger based on bigger rooms) and we
agree on a budget for the corridors, elevator cabs, lobby
and hotel preopening etc, we will have the right direction
to get the job done.

To its detriment, Fifth Avenue reasonably relied upon The Setai Group's assurances
that it would obtain a designer so that the "Setai San Diego" could open on-time per
the terms of the parties' contract.

32.    Eight days later (on or about July 10, 2007), Breene wrote Fifth
Avenue to advise them that "[w]e [The Setai Group] are arranging a lot of people to
come out to San Diego to go thru everything. We will need you guys to wire some
money into our account to pay for everything (airfairs (sic), hotels etc)."

33.    The next day, Benjamin responded to all of Breene's questions,
including the payment of the expenses of The Setai Group and its design team:

Jonathan,

We are excited to see all of you this week with your
new design team. It is a shame we lost 4 weeks with your
previous design team headed by Paul Haslhofer. We have
no problem covering the expenses for the new design
group staff and the Setai staff that will be arriving this
Thursday night. The protocol for our company is to
reimburse expenses by submitting paid receipts through
our construction loan administration.

We already have a joint venture agreement signed.
We are now focused on producing the branding
agreement and technical services agreement drafts which

1        should be ready to review in the next two weeks.  We can

2        discuss operational details of the joint venture while you

3        are in San Diego.

4        34.    As planned, the parties met over the weekend of July 14, 2007, in

5 California, to discuss action items for the "Setai San Diego."  On July 16, 2007,

6 Fifth Avenue sent an e mail to The Setai Group, its staff and its designers regarding

7 actions items for the project.

8        35.    On or about July 19, 2007, Breene sent Fifth Avenue "logo" designs

9 for the "Setai San Diego" that Setai's consultant, Pace Advertising, had prepared.

10 The "logo" that Pace prepared for The Setai Group, and which was sent by Breene

11 to Fifth Avenue, was for the "Setai San Diego."

12       36.    About four days later (on or about July 23, 2007), Rebeil advised

13 Breene that Fifth Avenue:  (i) still has "not heard from [The Setai Group's] design

14 team"; (ii) was "ready to [l]ay stone in the lobby [of the Setai San Diego]; and

15 (iii) needed a schedule from The Setai Group's designers because the contractor

16 Fifth Avenue hired threatened to "stop the job" if they did not get a schedule in the

17 near future.  That same, Breene responded by advising Fifth Avenue that "I

18 have left Derrick [Fagg ("Fagg")] [a member of The Setai Group's staff] a message

19 to follow up and find out where we are with Denniston [The Setai

20 Group's designer]."

21       37.    The next day (July 24, 2007), Fagg advised Fifth Avenue that:  (i) The

22 Setai Group "received the base and wallpaper samples [and was] awaiting info from

23 Tui to forward"; (ii) "I have no ststus (sic) on the Lobby rendering, I awaiting a

24 schedule from Denniston [The Setai Group's designer]"; and (iii) "I have the cad

25 drawings to communicate to Tui."

26       38.    That same day, Benjamin responded to Fagg's e-mail, confirmed that

27 Fifth Avenue had provided design (CAD) drawings of the "Setai San Diego" to The

28

LAI-2926610v1

1 Setai Group's designers, and stressed the need to have The Setai Group's designers
2 complete their tasks in a timely fashion:

3      Thanks for your update early this morning.
4      Please confirm if you received the guestroom spec books.
5      Otherwise we need to track the package immediately as it
6      was to arrive Monday morning by 10:30 am. Has Tui
7      sent you an address to forward him the materials you have
8      been collecting since the middle of last week. Does Mary
9      Lou [from Denniston] need any other CAD's or
10     information other than what we sent her on July 14 or
11     other materials that Steve Gaffney's office sent to you in
12     the middle of last week?

13     We need to keep Tui and Mary Lou on the fast
14     track regarding any information they need to complete
15     their tasks.

16     39.    The next day (July 25, 2007), Breene contacted Mary Lou from
17 Denniston [The Setai Group's designer], and advised her that he [Breene] was
18 "following up in regards to the design for the San Diego project." In his written
19 communication, Breene further emphasized that "we [The Setai Group and Fifth
20 Avenue] are under a very tight timetable and we need to make sure we hit the dates
21 otherwise we will be delayed in the hotel opening which will cost a lot of money":

22     Now that you know what is needed, we were
23     wanting to get some dates of when you can deliver the
24     drawings. As you know, we are under a very tight
25     timetable and we need to make sure we hit the dates
26     otherwise we will be delayed in the hotel opening which
27     will cost a lot of money.

28

LAI-2926610v1

14

1           Please let us know your dates of when we can start

2               receiving drawings?

3  Because of The Setai Group's breach of contract, the opening of the "Setai San

4  Diego" has been "delayed," and that circumstance has, in fact, "cost" Fifth Avenue

5  "a lot of money."

6       40.    The next day (July 26, 2007), Mary Lou (from Denniston) advised The

7  Setai Group and Fifth Avenue that Denniston understood that "the timeframe is

8  extremely tight[.]"   Denniston further acknowledged that Fifth Avenue was

9  spending considerable sums of money creating a hotel "product to be expected of a

10  Setai brand."

11      41.    That same day, Fifth Avenue responded to Denniston's e-mail:

12           We all agreed on Saturday, July 14 that you were

13          going to send us a schedule of deliverables by mid last

14          week.  As you know we needed to get up and running

15          rapidly regarding schedules and contracts.  John Murphy

16          scrambled to e mail you all the information you requested

17          on that very Saturday, July 14 so that you could begin

18          your analysis while traveling to San Diego.

19           It is very disappointing to find out nearly two

20          weeks later that no work has taken place on the schedule.

21          We are more than happy to sign a contract but need a

22          schedule of work and a proposal.

23  The Setai Group (Breene) responded to Denniston's e-mail that same day as well:

24           Thank you for your reply.  Yes it is a very tight

25          timetable so we need you and your team on this asap.

26           The fact that we met a number of weeks ago and

27          still you have not had a chance to discuss the scope of

28          work with Jean-Michel is disappointing.  I had hoped to

LAI-2926610v1

1    be further advanced (having signed your design team

2    contract and have (sic) you worked by now) and feel like

3    we lost valuable time.

4          We are waiting for you to send us a contract based

5    on the scope and will sign it quickly so that we can meet

6    the timetable. We also need the schedule of dates for the

7    various design drawings.

8          We are happy to sign a separate design contract for

9    the Beverly Hills project which will be a west coast

10    flagship for The Setai. We are hoping this would be look

11    (sic) at as a great incentive to do San Diego in a tight

12    timetable.

13        42.   As noted, under the *LOI—Setai West* contract, The Setai Group was

14    responsible for the design of the "Setai San Diego" and, ultimately, The Setai

15    Group decided that Denniston — Setai's hand-selected designer and whose foot-

16    dragging set the project back months —would be unable to perform in a timely

17    fashion for the "Setai San Diego" project. Accordingly, Fifth Avenue was forced to

18    mitigate it losses, and suggested that The Setai Group use the Rockwell Group

19    ("Rockwell") — Fifth Avenue's design consultant — to handle the re-design work

20    for the "Setai San Diego."

21        43.   The Setai Group met with Rockwell, agreed to use Rockwell and, in

22    reliance upon that agreement, Fifth Avenue entered a contract with Rockwell for

23    the design of the "Setai San Diego." On or about August 9, 2007, Fifth Avenue

24    sent a communication to The Setai Group confirming this contractual commitment

25    with Rockwell for the "Setai San Diego":

26          Rockwell is now fully signed up for the re-design

27    that was discussed with you in NYC. The agreement was

28    fully executed between 5th Avenue Partners and

LAI-2926610v1

16

1.            Rockwell Group as of Monday, August 6. Rockwell has

2             been getting up to speed for the last two weeks and is

3             excited about the project. They are looking forward to

4             meeting with you in Miami on Monday, August 13.

5    As of August of 2007, Setai knew that Fifth Avenue had retained Rockwell to do

6    the design work on the Diegan to bring that hotel up to "Setai" brand standards, and

7    that Fifth Avenue was, and would continue to be, expending considerable time and

8    money to accomplish this task.

9        44.   With Rockwell in place on the design, the next focus was finalizing

10    additional contract agreements for the "Setai San Diego," forming the corporate

11    structure for "Setai West" (such as forming, among other things, "Setai West, LLC"

12    and "Setai West Hotel Management, LLC"), hiring employees to run those

13    companies and to perform other important functions for those companies.

14        45.   For example, on or about August 29, 2007, Gorman forwarded to

15    The Setai Group and Fifth Avenue the redlined versions of additional agreements,

16    and noted, in her e-mail, that "the redline version indicates changes made pursuant

17    to our meeting in San Diego last Thursday as well as the comments that Jonathan

18    [Breene] sent to me [Tara] today." Gorman also wrote: "You will note that there

19    are minimal changes, so the review process should go fairly quickly. Please review

20    as quickly as possible with the goal as stated in our meeting to sign the attached

21    [agreements] tomorrow or Friday at the latest. I will send you the Beverly Hills

22    documents as soon as possible." Although The Setai Group agreed to all terms of

23    these agreements and, under the *LOI—Setai West* contract, was required in good

24    faith to enter these additional agreements, The Setai Group, in bad faith and without

25    justification, did not execute any of those agreements.

26        46.   On or about August 30, 2007, "Setai West, LLC" and "Setai West

27    Hotel Management, LLC," Delaware limited liability companies, were formed.

28

LAI-2926610v1

47.    In September of 2007, Fifth Avenue and The Setai Group hired Craig A. Waterman ("Waterman") as the "General Manager/Managing Director for the Setai West, LLC in San Diego."  Waterman's offer confirmation was on "The Setai Group" letterhead, and signed by W. Ted Wright ("Wright"), an employee of The Setai Group and the President & CEO of Setai West, LLC.  Thereafter, Waterman hired:  (i) Sandra Arbizu as the "Human Resource Manager" of the "Setai West Hotel Management, LLC"; and (ii) Grace Duncan as the "Director of Sales" of the "Setai West Hotel Management, LLC."  The salaries of all of these individuals were paid by Fifth Avenue (which The Setai Group knew).

48.    On or about September 10, 2007, Walid Sfeir, an employee of The Setai Group working on the "Setai San Diego" project (and whose expenses in connection with the project also were paid by Fifth Avenue (another fact The Setai Group knew)), updated Breene, Benjamin, and Wright on the hirings for the "Setai San Diego":

> Dear All,
>
> The following is a progress report for [Setai] San Diego project:
>
> • Craig Waterman is officially the General Manager, his starting date is October 1st, 2007
>
> • Craig spent the weekend at Setai, we toured the hotel extensively, also he interviewed four candidate managers for various departments:
>
> 1.    Peter Ybara, (Front Office Manager) formerly of Setai, Ritz Carlton

LAI-2926610v1

18

2.  Michael Kig, (Assistant Housekeeping Manager) formerly from Setai, Intercontinental

3.  Roy Rajeh, Guest Service Mgr, Formerly of Setai, Towne park at Mandarin Oriental and Shore Club

4.  Paula Sansone, (Geneal (sic) Admin) formerly of the Setai and Four Seasons

- Ted will meet in New York with a candidate Grace Duncan (Sales Director), she is currently with the Morgan Group and worked with the Essex House NY, Hotel Nikko.

- Sandra Arbizu will join us as Human resources Training Manager, She was the training Mgr for the Four Seasons Los Angeles for the past Three years. Saundra (sic) will help us with all the HR functions until we finalize the hiring of an HR director.

- Dzeneta Arslanovic is candidate for The Spa Manager, She was the Spa Director of the Shore Club and Now she is a Director of great Spa in Arizona.

- We are in the final stages of finishing the Training Manuals for all departments. We will have all manuals ready by October 1st ready.

LAI-2926610v1

19

- •      Judy Calkins is a strong candidate for Controller, she need (sic) to do a final interview with Ted [Wright] and Tom [Benjamin].

- •      Ted, MMaranta, Chef Shaun and myself reviewed the China Grill contract, we have some inputs and concerns.

49.    On or about September 18, 2007, Rockwell sent the design renderings for the "Setai San Diego" to The Setai Group, who then forwarded copies of those drawings to Fifth Avenue. Rockwell was paid by Fifth Avenue for those drawings (another fact The Setai Group knew). That same day, The Setai Group sent Fifth Avenue the "Brand Standards" (Operating Standards and Physical Standards) for the "Setai San Diego."

50.    On or about October 9, 2007, Breene sent Fifth Avenue revised "logo" designs for the "Setai San Diego" that The Setai Group's consultant, Pace Advertising, had prepared. The revised "logo" that Pace prepared for The Setai Group, and that was sent by Breene to Fifth Avenue, was for the "Setai San Diego."

51.    On or about October 10, 2007, Wright (of The Setai Group) put Fifth Avenue in touch with The Setai Group's designer of conceptual drawings for the "Setai San Diego" and, in that written communication, noted: "Greg [the designer] Steve Rebeil, the developer of our [The Setai Group's and Fifth Avenue's] San Diego property and a very dynamic guy is interested in learning more [about the conceptual drawing for the 'Setai San Diego']."

52.    About one week later (on or about October 18, 2007), The Setai Group, through its attorney, Richard J. Burton, Esq., inexplicably and improperly repudiated the *LOI—Setai West* contract. The reasons given for the repudiation were pretextual. On or about October 30, 2007, Conroy did the exact same thing, and advised Fifth Avenue that "the Setai Group believes that there is no binding

1    agreement between us and we will no longer be working on the project.  To that

2    end, please refrain from using any reference to the Setai name in all marketing

3    materials.  Any future correspondence from us will come from our attorney,

4    Richard Burton."

5        53.    In addition to foregoing, The Setai Group, in bad faith and without

6    justification, refused to communicate with Fifth Avenue including, but not limited

7    to, failing to appear for weekly conference calls on the parties' on-going hotel

8    projects (such as the "Setai San Deigo").

9        54.    From the date the *LOI—Setai West* contract was executed and became

10    legally binding on May 23, 2007, through and including The Setai Group's

11    improper repudiation of that contract in late October 2007, Fifth Avenue, among

12    other things, literally has spent thousands of hours of man-hours and over

13    $26 million of Fifth Avenue money (including on bricks and mortar) in reliance

14    upon Fifth Avenue's contract with The Setai Group, and The Setai Group knew

15    Fifth Avenue was spending this time and money.  Fifth Avenue continues to spend

16    substantial amounts of time and money on this and other "Setai" projects in reliance

17    upon the *LOI—Setai West* contract.  The "Setai San Diego" is scheduled to open in

18    the Spring of 2008.

19                **FIRST CAUSE OF ACTION**

20                    **(Breach of Contract)**

21        55.    Plaintiffs repeat, reallege, and incorporate by reference, as though fully

22    set out herein, the allegations contained in Paragraphs 1-54, above.

23        56.    On May 23, 2007, Fifth Avenue and The Setai Group entered into the

24    *LOI-Setai West* contract.  The parties' course of dealing under that contract

25    independently establishes that the *LOI—Setai West* is a binding and enforceable

26    contract upon the parties.

27

28

LAI-2926610v1

21

57.    The Setai Group breached that contract by, among other things:

      •    Attempting to withdraw its contractually-required contribution of the "Setai" brand;

      •    Failing to contribute its expertise in design and management of luxury hotels in a timely and proper fashion, as required under the *LOI—Setai West* contract (which, among other things, delayed the opening of the "Setai San Diego");

      •    Failing to communicate with Fifth Avenue;

      •    Failing to execute any of the additional agreements with Fifth Avenue, as required under the *LOI—Setai West* contract;

      •    Repudiating the *LOI—Setai West* contract without justification.

58.    Fifth Avenue has performed all conditions, covenants and promises in accordance with the contract, except for terms that The Setai Group prevented Fifth Avenue from performing or terms that were excused by The Setai Group's breach.

59.    As a result of The Setai Group's actions and omissions, as alleged herein, Fifth Avenue has suffered damages in excess of the jurisdictional requirements of this Court. Fifth Avenue continues to incur additional damages as a result of The Setai Group's actions and omissions.

60.    Although Fifth Avenue has been damaged as a result of The Setai Group's breach of contract, Fifth Avenue does not have an adequate remedy at law, and specific performance of the parties' contract should be ordered — i.e., monetary damages against The Setai Group will not make Fifth Avenue whole and Fifth Avenue will suffer irreparable harm absent an order of specific performance. Fifth Avenue entered into the *LOI—Setai West* contract with The Setai Group for the purpose of using the "Setai" brand name. After The Setai Group contributed the brand name "Setai," Fifth Avenue, among other things, has spent millions of dollars on bringing the Diegan hotel up to "Setai" brand standards. Fifth Avenue is entitled to the benefit of its bargain, including the right to use the "Setai" brand

LAI-2926610v1

1  name in connection with the "Setai San Diego," the "Setai Beverly Hills," and other

2  hotel projects under the "Setai" name per the *LOI—Setai West* contract.

3      61.    In the alternative, given the parties' course of performance under the

4  *LOI—Setai West* contract, The Setai Group should be estopped from denying Fifth

5  Avenue the right to use the "Setai" brand name in connection with the "Setai San

6  Diego," the "Setai Beverly Hills," and other hotel projects under the "Setai" name

7  per the *LOI—Setai West* contract.

8                          **SECOND CAUSE OF ACTION**

9          **(Breach of the Covenant of Good Faith and Fair Dealing)**

10     62.    Plaintiffs repeat, reallege, and incorporate by reference, as though fully

11  set out herein, the allegations contained in Paragraphs 1-61, above.

12     63.    The LOI—Setai West contract provides that it "shall be governed by

13  the laws of the State of California, without giving effect to any principles regarding

14  choice of laws[.]"

15     64.    Under California law, every contract has a covenant of good faith and

16  fair dealing.

17     65.    The Setai Group breached the *LOI—Setai West* contract's covenant of

18  good faith and fair dealing by, among other things:

19          •    Attempting to withdraw its contractually-required contribution

20               of the "Setai" brand;

21          •    Failing to contribute its expertise in design and management of

22               luxury hotels in a timely and proper fashion, as required under

23               the *LOI—Setai West* contract (which, among other things,

24               delayed the opening of the "Setai San Diego");

25          •    Failing to communicate with Fifth Avenue;

26          •    Failing to execute any of the additional agreements with Fifth

27               Avenue, as required under the *LOI—Setai West* contract;

28

1    •    Repudiating the *LOI—Setai West* contract without justification.
2  In doing the foregoing acts, The Setai Group acted in bad faith, with malice, and
3  without justification.

4    66.    Fifth Avenue has performed all conditions, covenants and promises in
5  accordance with the contract, except for terms that The Setai Group prevented Fifth
6  Avenue from performing or terms that were excused by The Setai Group's breach.

7    67.    As a result of The Setai Group's actions and omissions, as alleged
8  herein, Fifth Avenue has suffered damages in excess of the jurisdictional
9  requirements of this Court. Fifth Avenue continues to incur additional damages as
10 a result of The Setai Group's actions and omissions.

11    68.    Although Fifth Avenue has been damaged as a result of The Setai
12 Group's breach of the *LOI—Setai West* contract's covenant of good faith and fair
13 dealing, Fifth Avenue does not have an adequate remedy at law, and specific
14 performance of the parties' contract should be ordered — i.e., monetary damages
15 against The Setai Group will not make Fifth Avenue whole and Fifth Avenue will
16 suffer irreparable harm absent an order of specific performance. Fifth Avenue
17 entered into the *LOI—Setai West* contract with The Setai Group for the purpose of
18 using the "Setai" brand name. After The Setai Group contributed the brand name
19 "Setai," Fifth Avenue, among other things, has spent millions of dollars on bringing
20 the Diegan hotel in San Diego up to "Setai" brand standards. Fifth Avenue is
21 entitled to the benefit of its bargain, including the right to use the "Setai" brand
22 name in connection with the "Setai San Diego," the "Setai Beverly Hills," and other
23 hotel projects under the "Setai" name per the *LOI—Setai West* contract.

24    69.    In the alternative, given the parties' course of performance under the
25 *LOI—Setai West* contract, The Setai Group should be estopped from denying Fifth
26 Avenue the right to use the "Setai" brand name in connection with the "Setai San
27 Diego," the "Setai Beverly Hills," and other hotel projects under the "Setai" name
28 per the *LOI—Setai West* contract.

LAI-2926610v1

## THIRD CAUSE OF ACTION

## (Declaratory and Injunctive Relief)

70.    Plaintiffs repeat, reallege, and incorporate by reference, as though fully set out herein, the allegations contained in Paragraphs 1-69, above.

71.    There presently exists a dispute between Fifth Avenue and The Setai Group regarding their rights and obligations to each other.

72.    On May 23, 2007, Fifth Avenue and The Setai Group entered into the *LOI-Setai West* contract.    The parties' course of dealing under that contract independently establishes that the *LOI—Setai West* is a binding and enforceable contract upon the parties.

73.    The Setai Group breached that contract by, among other things:

- Attempting to withdraw its contractually-required contribution of the "Setai" brand;

- Failing to contribute its expertise in design and management of luxury hotels in a timely and proper fashion, as required under the *LOI—Setai West* contract (which, among other things, delayed the opening of the "Setai San Diego");

- Failing to communicate with Fifth Avenue;

- Failing to execute any of the additional agreements with Fifth Avenue, as required under the *LOI—Setai West* contract;

- Repudiating the *LOI—Setai West* contract without justification.

74.    Fifth Avenue has performed all conditions, covenants and promises in accordance with the contract, except for terms that The Setai Group prevented Fifth Avenue from performing or terms that were excused by The Setai Group's breach.

75.    Fifth Avenue is entitled to declaratory relief providing for the following:

- A declaration that the *LOI—Setai West* contract is binding and enforceable;

LAI-2926610v1

25

- A declaration that The Setai Group is estopped from denying the existence and enforceability of the *LOI—Setai West* contract;

- A declaration that Fifth Avenue is entitled to the benefit of its bargain, including the use of the "Setai" brand name in connection with the "Setai San Diego," the "Setai Beverly Hills," and other hotel projects under the "Setai" name per the *LOI—Setai West* contract;

- A declaration that The Setai Group is estopped from denying Fifth Avenue the benefit of its bargain, including the use of the "Setai" brand name in connection with the "Setai San Diego," the "Setai Beverly Hills," and other hotel projects under the "Setai" name per the *LOI—Setai West* contract.

- A declaration that the Initial Definitive Agreements (as defined under the *LOI—Setai West* contract), which The Setai Group agreed to but wrongfully refused to execute, are valid and enforceable.

- A declaration that The Setai Group is estopped from denying that the Initial Definitive Agreements (as defined under the *LOI—Setai West* contract), which The Setai Group agreed to but wrongfully refused to execute, are valid and enforceable.

76.    Fifth Avenue also is entitled to injunctive relief against The Setai Group, including:

- A temporary restraining order and/or a preliminary injunction to preserve the *status quo*, and to prevent The Setai Group, and each of its directors, officers, members, partners, employees, agents and representatives, and all those acting in concert or participating with them, from denying Fifth Avenue the right to use the "Setai" brand name in connection with the "Setai San

LAI-2926610v1

26

Diego," the "Setai Beverly Hills," and other hotel projects under the "Setai" name per the *LOI—Setai West* contract while issues regarding the rights and obligations of The Setai Group and Fifth Avenue are being adjudicated;

- A permanent injunction to prevent The Setai Group, and each of its directors, officers, members, partners, employees, agents and representatives, and all those acting in concert or participating with them, from denying Fifth Avenue the right to use the "Setai" brand name in connection with the "Setai San Diego," the "Setai Beverly Hills," and other hotel projects under the "Setai" name per the *LOI—Setai West* contract.

77.    Fifth Avenue has no adequate remedy at law, and cannot be adequately compensated for the damages and injuries it has sustained and will sustain by the acts, errors or omissions of The Setai Group.   Absent an order of specific performance and/or an injunction to prevent The Setai Group, and each of its directors, officers, members, partners, employees, agents and representatives, and all those acting in concert or participating with them, from denying Fifth Avenue the right to use the "Setai" brand name in connection with the "Setai San Diego," the "Setai Beverly Hills," and other hotel projects under the "Setai" name per the *LOI—Setai West* contract, Fifth Avenue will suffer irreparable harm.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully demand judgment:

1.    Specific performance of the *LOI—Setai West* contract.

2.    A declaration that the *LOI—Setai West* contract is binding and enforceable.

3.    A declaration that The Setai Group is estopped from denying the existence and enforceability of the *LOI—Setai West* contract.

LAI-2926610v1

4. A declaration that Fifth Avenue is entitled to the benefit of its bargain, including the use of the "Setai" brand name in connection with the "Setai San Diego," the "Setai Beverly Hills," and other hotel projects under the "Setai" name per the *LOI—Setai West* contract.

5. A declaration that The Setai Group is estopped from denying Fifth Avenue the benefit of its bargain, including the use of the "Setai" brand name in connection with the "Setai San Diego," the "Setai Beverly Hills," and other hotel projects under the "Setai" name per the *LOI—Setai West* contract.

6. A declaration that the Initial Definitive Agreements (as defined under the *LOI—Setai West* contract), which The Setai Group agreed to but wrongfully refused to execute, are valid and enforceable.

7. A declaration that The Setai Group is estopped from denying that the Initial Definitive Agreements (as defined under the *LOI—Setai West* contract), which The Setai Group agreed to but wrongfully refused to execute, are valid and enforceable.

8. A temporary restraining order and/or a preliminary injunction to preserve the *status quo*, and to prevent The Setai Group, and each of its directors, officers, members, partners, employees, agents and representatives, and all those acting in concert or participating with them, from denying Fifth Avenue the right to use the "Setai" brand name in connection with the "Setai San Diego," the "Setai Beverly Hills," and other hotel projects under the "Setai" name per the *LOI—Setai West* contract while issues regarding the rights and obligations of The Setai Group and Fifth Avenue are being adjudicated.

9. A permanent injunction to prevent The Setai Group, and each of its directors, officers, members, partners, employees, agents and representatives, and all those acting in concert or participating with them, from denying Fifth Avenue the right to use the "Setai" brand name in connection with the "Setai San Diego,"

LAI-2926610v1

1 | the "Setai Beverly Hills," and other hotel projects under the "Setai" name per the

2 | *LOI—Setai West* contract.

3 |      10.    Compensatory, incidental and consequential damages in excess of the

4 | jurisdictional requirements of this Court in an amount to be proven at trial.

5 |      11.    Restitution, as permitted by law, in excess of the jurisdictional

6 | requirements of this Court in an amount to be proven at trial.

7 |      12.    Exemplary and/or punitive damages, as permitted by law, in excess of

8 | the jurisdictional requirements of this Court in an amount to be proven at trial.

9 |      13.    Attorneys' fees and costs, as permitted by law.

10 |      14.    For further necessary or proper relief based upon the declaratory

11 | judgment or decree the Court may grant herein.

12 |      15.    For other and further relief as the Court may deem just and equitable.

13 | Dated: January 22, 2008             Respectfully submitted,

14 |

15 |                              JONES DAY

16 |

17 |                              By:

18 |                                Thomas R. Malcolm

19 |                              Attorneys for Plaintiffs<br>5TH AVENUE PARTNERS, LLC,

20 |                              STEVE REBEIL, AND TOM<br>BENJAMIN

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

1

## DEMAND FOR JURY TRIAL

2

Under Federal Rule of Civil Procedure 38(b) and Local Rule 38-1 of the

3
Southern District of California, Plaintiffs hereby demand a trial by jury on all issues

4
triable in this action.

5

6
Dated:  January 22, 2008                     Respectfully submitted,

7

8                                            JONES DAY

9

10                                           By:
                                                 Thomas R. Malcolm

11

12                                           Attorneys for Plaintiffs
                                             5TH AVENUE PARTNERS, LLC,
                                             STEVE REBEIL, AND TOM
13                                           BENJAMIN

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BLUEBIRD OFFICE SUPPLIES
(888) 477-0700
www.bluebirdonline.com

May 23, 2007

Mr. Jonathan Breene
Mr. John Conroy
The Setai Group LLC
The Chrysler Building
405 Lexington Avenue
54th Floor
New York, NY 10174

Re:     Letter of Intent – Setai West

Dear Jonathan and John:

This letter ("Letter") and the term sheet attached hereto as Exhibit A (the "Term Sheet") set forth the basis on which SR/TB Newco, or a subsidiary or affiliate thereof, the principals of which shall be Steve Rebeil and Tom Benjamin ("SR/TB") is willing to enter into negotiations with the intention to agree on the following definitive agreements and such other agreements as may be later determined to be necessary and appropriate (the "Definitive Agreements"): (i) a joint venture agreement (the "JV Agreement") to form a joint venture, limited liability company, partnership or other mutually acceptable form of entity (the "JV"), by the name of "Setai West" or another name mutually agreed upon by the parties, with The Setai Group LLC, a New York limited liability company, or a subsidiary or affiliate thereof ("Setai") for the purpose of developing luxury hotels (individually "Project", collectively, "Projects") on the west coast of the United States of America, in Hawaii and in Mexico (the "Designated Area"), (ii) one or more branding rights agreements, license agreements or similar agreements ("Branding Agreements") to govern the use of the "Setai" brand ("Brand") by the JV in connection with the Projects, (iii) one or more hotel management agreements or similar agreements ("Hotel Management Agreements") to govern the management of the Projects by Setai on behalf of the JV, and (iv) one or more pre-opening and technical services agreements ("Pre-Opening and Technical Services Agreements") to govern the pre-opening services and functions to be performed by Setai in connection with the Projects on behalf of the JV. This Letter and the Term Sheet are referred to collectively herein as this "Letter of Intent."

1.     Binding Letter of Intent and Negotiation.

(a)     Negotiation Period. This Letter of Intent shall be binding on the parties. This Letter of Intent shall remain in effect from the date this Letter is countersigned and delivered by Setai (as set forth below) ("Effective Date") until (i) with respect to the JV Agreement, the execution and delivery of the JV Agreement, (ii) with respect to the Diegan BMA (as defined in Section 2 of the Term Sheet), the execution and delivery of the Diegan BMA, (iii) with respect to the Diegan POTSA (as defined in Section 2 of the Term Sheet), the execution and delivery of the Diegan POTSA, and (iv) with respect to the Diegan HMA (as defined in Section 2 of the Term Sheet), the execution and delivery of the Diegan HMA.

(b)     Negotiation of Definitive Agreements. During that period of time commencing on the Effective Date and expiring ninety (90) days thereafter (the "Negotiation Period"), the parties shall enter negotiations with the intention being to agree on and enter into the following Definitive Agreements listed in order of priority ("Initial Definitive Agreements"), which shall include the terms set forth in the Term Sheet and such other terms as agreed to by the parties that are consistent with this Letter of Intent:

        1.      Diegan BMA
        2.      Diegan POTSA
        3.      JV Agreement
        4.      Diegan HMA

EXHIBIT __1__ PAGE __31__

Setai West
May 23, 2007
Page 2

(c)    Form of Definitive Agreements.  As soon as reasonably practical following the execution of this Letter of Intent, SR/TB will provide Setai initial drafts of the Initial Definitive Agreements, incorporating the terms set forth in the Term Sheet.

2.    Confidentiality.

(a)    Setai and SR/TB each agree that neither they nor any of their respective officers, directors, affiliates, representatives, or advisors shall make any public announcement with respect to this Letter of Intent or the transactions contemplated hereby, or disclose the terms or existence of this Letter of Intent to any third party (other than to SR/TB's and Setai's respective advisors, representatives, and agents, on a need-to-know basis, for purposes of evaluating and negotiating the transactions contemplated by this Letter of Intent or as may be required by law, in which case, SR/TB and Setai shall consult with each other prior to such disclosure) without the prior written consent of SR/TB or Setai, as applicable. This Paragraph shall survive the termination of this Letter of Intent.

(b)    Setai and SR/TB shall cooperate to issue press releases in connection with the Diegan Project (as defined in Section 2 of the Term Sheet), the general manager of the Diegan Project, and that certain Project in Beverly Hills, California ("Press Releases") no later than three (3) business days after the Effective Date.  SR/TB shall provide a copy of each of the proposed Press Releases to Setai for Setai's approval.  Setai shall review such Press Releases within one (1) business day of Setai's receipt of such submission, provided however, if Setai shall fail to approve or reject any such submission within such one (1) business day period, SR/TB may send a second written notice along with a follow up telephone call and an e-mail to Setai.  If Setai shall fail to reply within one (1) business day following Setai's receipt of the second notice, Setai's approval shall be deemed to have been given.

3.    Indemnification.

(a)    Setai shall indemnify and hold harmless SR/TB and its respective affiliates and their respective shareholders, trustees, partners, members, beneficiaries, directors, officers, managers, security holders, employees, agents and representatives, and the successors and assigns of each of the foregoing (the "SR/TB Indemnified Parties"), for, from and against any liability, damage, loss, cost or expense, including, without limitation, attorneys' fees and court costs, incurred by any of the SR/TB Indemnified Parties in any claim, lawsuit or other legal action or proceeding brought by any third party arising from or relating to the negotiation and execution of this Letter of Intent or the Initial Definitive Agreements.  This Paragraph shall survive the termination of this Letter of Intent.

(b)    SR/TB shall indemnify and hold harmless Setai and its respective affiliates and their respective shareholders, trustees, partners, members, beneficiaries, directors, officers, managers, security holders, employees, agents and representatives, and the successors and assigns of each of the foregoing (the "Setai Indemnified Parties"), for, from and against any liability, damage, loss, cost or expense, including, without limitation, attorneys' fees and court costs, incurred by any of the Setai Indemnified Parties in any claim, lawsuit or other legal action or proceeding brought by any third party to the extent any such claim, lawsuit or other legal action or proceeding results from a breach by SR/TB of any agreement between SR/TB and such third party as a result of the negotiation and execution of this Letter of Intent or the Initial Definitive Agreements.  This Paragraph shall survive the termination of this Letter of Intent.

4.    No Personal Liability.  No shareholder, trustee, partner, member, beneficiary, director, officer, manager, security holder, employee, agent, representative or other person acting for or on behalf of Setai or SR/TB shall have any personal liability for any obligations entered into for or on behalf of

WDC 371430640v7.999911.889857

EXHIBIT 1 PAGE 32

Setai West
May 23, 2007
Page 3

either such party, and the assets of any such person shall not be subject to any claims or actions relating to any obligations of Setai or SR/TB. This Paragraph shall survive the termination of this Letter of Intent.

     5.    <u>Governing Law</u>.  This Letter of Intent shall be governed by the laws of the State of California, without giving effect to any principles regarding conflict of laws, but venue of all proceedings relating to this Letter of Intent shall be in the State of California.

     6.    <u>Binding Effect</u>.  Setai and SR/TB acknowledge and agree that this Letter of Intent shall create a legally binding obligation on the parties to enter into the Initial Definitive Agreements.  In addition, the obligations of Setai and SR/TB contained in Paragraphs 1(a), (d), 2, 3, 4, 5 and 6 this Letter of Intent shall be binding and enforceable on them.

     If Setai agrees to the terms set forth in this Letter of Intent, please have a duly authorized person countersign this Letter of Intent on behalf of Setai and return it to the undersigned at your earliest convenience.

     We look forward to working with you on this transaction.

Sincerely,

5/23/07

Steven Rebeil

5/23/07

Thomas Benjamin

WDC 371430940v7 999911.889657

EXHIBIT __1__ PAGE __33__

Setai West
May 23, 2007
Page 4

**ACKNOWLEDGED, ACCEPTED AND AGREED BY:**
**THE SETAI GROUP, LLC,** a New York limited liability company

By: _____

Name: _____

Title: _____ MeMBeR

Date: _____

WDC 371430940v7 909911.889857

EXHIBIT  1  PAGE  34

Setai West
May 23, 2007
Page 5

## EXHIBIT A

### JV AGREEMENT
**Term Sheet**

| | |
|---|---|
| **1. Members** | Setai (50% ownership interest in the JV) and SR/TB (50% ownership interest in the JV). |
| **2. Negotiation Period** | During the Negotiation Period:<br>• The parties will prepare the Business Plan and Budget that would set forth the intended development and funding strategy for the JV and for each Project the JV is currently undertaking (the "BP&B").  The BP&B would become the working plan for management and funding of the JV and the Projects.  The BP&B would be updated on an annual basis by the Members, or more frequently if required.  Any material variances from the approved BP&B would require the approval of both Members.<br>• The parties will prepare the following Initial Definitive Agreements:<br>   o the JV Agreement:<br>   o the Branding Agreement ("Diegan BMA") for that certain 185 unit condominium hotel property located at 1047 5th Avenue in San Diego, California, which shall be known as "Setai San Diego" ("Diegan Project"), which is owned by 5th Avenue Partners, LLC, an affiliate of SR/TB ("5th Avenue Partners");<br>   o the Hotel Management Agreement for the Diegan Project ("Diegan HMA"); and<br>   o the Pre-Opening and Technical Services Agreement for the Diegan Project ("Diegan POTSA"). |
| **3. Fees** | The following fees will be earned by the JV, and through the JV shared equally (50% to Setai and 50% to SR/TB):<br><br>• branding fees pursuant to the Branding Agreements (but specifically excluding sales commissions earned for the sale of condominium units in the Diegan Project for which as of the earlier to occur (i) the commencement date of the JV Agreement, or (ii) the commencement date of the Diegan BMA, a contract of purchase and sale ("Existing Contract") has been signed by a purchaser (such condominium units being referred to as "Sold Units").  All other condominium units in the Diegan Project shall be referred to as "Available Units";<br>• hotel management fees and incentive fees pursuant to the Hotel Management Agreements;<br>• technical services fees pursuant to the Technical Services Agreements; and<br>• development fees (excluding development fees for the Diegan Project which will be retained by 5th Avenue Partners).<br><br>Notwithstanding the foregoing, in the event that a third party brings a project to Setai which requires only branding and management, Setai shall receive one hundred percent (100%) of the branding fees.  The hotel management fees (including incentive fees) and the technical services fees shall be shared equally |

WDC 371430640v7 999911.889657

EXHIBIT 1 PAGE 35

Setai West
May 23, 2007
Page 6

| | |
|---|---|
| | through the JV (50% to Setai and 50% to SR/TB). |
| 4. Designated Area | The JV will have the exclusive right to sell, market, develop or operate properties using the Brand within the west coast of the United States of America (as more specifically defined in the JV Agreement), in Hawaii and in Mexico (the "Designated Area").  Setai agrees that neither Setai, nor any of its affiliates or other related entities or persons, nor any shareholder, trustee, partner, member, director, officer, manager, employee, agent or representative, or any person acting for or on behalf of any of the foregoing persons or entities, shall be permitted to solicit, pursue, negotiate, work or consult with any other party with respect to hotel projects or any other resort development in the Designated Area, other than the Current Proposed Projects (as defined in this Section 4).<br><br>The parties acknowledge that Setai is currently in negotiations with third parties in connection with hotel projects in Palm Desert, Napa Valley, Cabos, Puerto Vallarta, Punta Mita, and Sayulita ("Current Proposed Projects").  In the event that Setai determines, in its sole discretion, to pursue any or all of the Current Proposed Projects ("Accepted Current Proposed Projects"), such Accepted Current Proposed Project shall become a project of the JV, be included in the definition of "Projects" in the JV Agreement, and thereafter proceed as a Project of the JV subject to terms and conditions substantially identical (but subject to variations relating to local law and the specific Project) to those terms and conditions of any other JV Project (as defined in Section 12 of this Term Sheet). |
| 5. Governing Board | The Members shall formulate a governing board or committee ("Governing Board") containing at least three (3) members, comprised of (i) one representative of Setai, (ii) one representative of SR/TB, and (iii) one member mutually agreed upon by the parties.  The sole purpose of the Governing Board shall be to review, analyze and accept or reject proposed Projects within the Designated Area ("Proposed Projects").<br><br>If a Proposed Project is presented to the Governing Board, the Governing Board shall approve or reject, with an explanation of the reasons for rejection, any such submission within ten (10) business days after receipt of a written submission of the Proposed Project.  A Proposed Project which is accepted by the Governing Board shall be initially evidenced by a binding letter of intent in connection with the Proposed Project, and the negotiation of the Definitive Agreements in connection with the Proposed Project shall commence promptly thereafter. |
| 6. Proposal of Projects Outside of the Designated Area | SR/TB shall have the right and option to (i) enter into mutually acceptable binding agreements with Setai for transactions to license the Brand outside of the Designated Area, and (ii) match, with a comparable opportunity (as determined by Setai in its sole discretion), any other project presented to Setai by any other party outside of the Designated Area.  Such projects shall be referred to individually as a "Outside Proposed Project".<br><br>If an Outside Proposed Project is presented to Setai, Setai shall approve or reject, with an explanation of the reasons for rejection, any such submission within fifteen (15) business days after receipt of a written proposal for such Outside Proposed Project.  An Outside Proposed Project which is accepted by Setai ("Accepted Project"), shall be evidenced by a binding letter of intent in |

EXHIBIT 1  PAGE 36

Setai West
May 23, 2007
Page 7

| | |
|---|---|
| | connection with the Accepted Project, and the Accepted Project shall become a project of the JV, shall be included in the definition of "Projects" in the JV Agreement, and thereafter proceed as a Project of the JV subject to terms and conditions substantially identical (but subject to variations relating to local law and the specific Project) to those terms and conditions of any other JV Project (as defined in Section 12 of this Term Sheet). |
| 7.  Current Outside Projects | SR/TB acknowledges that Setai is currently involved in projects with the Brand in New York City, the Bahamas, and Costa Rica ("Current Outside Projects").  The JV shall have the right to purchase fifty percent (50%) of Setai's interest in the branding fees, hotel management fees, technical services fees, development fees, marketing fees, sales commissions (including new and re-sale), and any other fees related to the Current Outside Projects.  SR/TB and Setai acknowledge that they intend to negotiate, diligently and in good faith, the terms and conditions for the exercise of the purchase right set forth in this Section 7, including, by way of example only and not as a limitation (i) the duration of the purchase right, (ii) the manner of exercise of the purchase right, and (iii) the methodology for the valuation of the interest to be acquired by SR/TB. |
| 8.  Brand Standards | The parties acknowledge that it is critical that Setai control the standards governing the Brand ("Brand Standards").  Therefore, Setai shall have fifty one percent (51%) voting rights and control over all decisions regarding the Brand Standards. |
| 9.  Setai Fund I | SR/TB shall create an equity fund for the purpose of developing the Projects, including Accepted Projects, Accepted Current Proposed Projects, if any, and Current Outside Projects, if any ("Setai Fund I").  SR/TB shall own and manage Setai Fund I and shall have sole responsibility for creating and maintaining Setai Fund I.  Setai Fund I shall be separate and apart from the JV.  A representative of Setai shall hold a position on the board of directors of the Setai Fund I.<br><br>Any third party financing of Setai Fund I shall be non-recourse to the Members (other than standard non-recourse carve-outs for "bad boy" acts, and environmental indemnities if required).  The Members intend to use a prudent amount of debt under commercially reasonable financing conditions to finance the Projects. |
| 10.  Responsibilities | The parties acknowledge that each party has unique and specialized skills to contribute to the JV.<br>• SR/TB shall contribute its expertise in hotel development.<br>• SR/TB shall contribute its ability to raise capital for the Projects through Setai Fund I.<br>• SR/TB shall contribute the following Projects:<br>    • to Diegan Project;<br>    • that certain project located at 8484 Wilshire Boulevard, Beverly Hills, California, which shall be known as "Setai Beverly Hills" ("Beverly Hills Project"); and |

WDC 371430640v7.999911.889857

EXHIBIT _1_ PAGE _37_

Setai West
May 23, 2007
Page 8

| | |
|---|---|
| | • that certain project site located in San Francisco, California.<br>• Setai shall contribute the Brand and its expertise in design and management of luxury hotels.<br><br>All of the foregoing shall be more specifically set forth in the JV Agreement. |
| **11. Member Investment Rights** | Except for Current Outside Projects, each of SR/TB and Setai shall have the right to invest equity on a para passu basis for any Project, including Accepted Projects. |
| **12. Sale or Initial Public Offering of Setai Worldwide Brand** | In the event that the Setai Worldwide Brand is sold or is the subject of an initial public offering ("Setai Sale"), the Projects, Accepted Projects, the Current Outside Projects and Accepted Current Proposed Projects (collectively, "JV Projects"), shall receive a pro rata value on any such Setai Sale. The calculation of the JV's interest in the Setai Sale shall be based on a straight proportion of (i) the total gross revenue generated by the JV Projects, and (ii) the total corporate revenue created by the Setai Worldwide Brand. |
| **13. Diegan Project** | The Diegan Project is scheduled to be completed by December 2007. The JV shall receive no development fees for the Diegan Project and the Diegan Project will continue to be owned by 5th Avenue Partners. |
| | Diegan BMA:<br><br>In connection with the Diegan Project the JV shall enter into a the Diegan BMA with 5th Avenue Partners on the following terms and conditions:<br><br>5th Avenue Partners shall pay to the JV as consideration for the use of the Brand and the JV's obligations under the Diegan BMA the following ("Brand Fees"):<br>• a base fee equal to two percent (2%) of any gross sales proceeds from the sale of each Available Unit ("Gross Sales Proceeds") up to a break point of $1,383 per square foot; plus<br>• five percent (5%) of any Gross Sales Proceeds in excess of $1,383 per square foot up to a break point of $1,483 per square foot; plus<br>• ten percent (10%) of any Gross Sales Proceeds in excess of $1,483 per square foot up to a break point of $1,583 per square foot; plus<br>• fifteen percent (15%) of any Gross Sales Proceeds in excess of $1,583 per square foot up to a break point of $1,683 per square foot; plus<br>• twenty percent (20%) of any Gross Sales Proceeds in excess of $1,683 per square foot up to a break point of $1,783 per square foot; plus<br>• twenty-five percent (25%) of any Gross Sales Proceeds in excess of $1,783 per square foot up to a break point of $1,883 per square foot; plus<br>• thirty percent (30%) of any Gross Sales Proceeds in excess of $1,883 per square foot up to a break point of $1,983 per square foot; plus<br>• thirty-five percent (35%) of any Gross Sales Proceeds in excess of $1,983, up to a break point of $2,083 per square foot; plus<br>• forty percent (40%) of any Gross Sales Proceeds in excess of $2,083 per square foot up to a break point of $2,183 per square foot; plus<br>• forty-five percent (45%) of any Gross Sales Proceeds in excess of |

EXHIBIT *1* PAGE 38

Setai West
May 23, 2007
Page 9

$2,183 up to a break point of $2,283 per square foot; plus
- fifty percent (50%) of any Gross Sales Proceeds in excess of $2,283 per square foot.

Setai expressly acknowledges that 5th Avenue Partners shall have no obligation to pay to the JV any Brand Fees or sales commissions in connection with Sold Units or Existing Contracts.

Diegan HMA:

5th Avenue Partners shall pay to the JV the following fees as consideration for the JV's services, in the capacity of "Operator" under the Diegan HMA (collectively, "Management Fees"):

(a)　a base fee (the "Base Fee") equal to four percent (4%) of Gross Operating Revenue (as defined pursuant those accounting principles, conventions, rules, procedures, and practices, consistently applied, affecting all aspects of recording and reporting financial transactions which are generally accepted and applied to the hospitality industry by major international independent accounting firms, and as more particularly defined in the Diegan HMA ("HMA Definition")) for each fiscal year of the term of the HMA ("Fiscal Year"); and

(b)　an incentive fee (the "Incentive Fee") equal to fifteen percent (15%) of the difference between Gross Operating Profit (as defined in the HMA Definition) for each Fiscal Year and the Owner's Preferred Return (hereinafter defined).

"Owner's Preferred Return" shall be applicable solely to the calculation of the Incentive Fee and shall mean, with respect to each Fiscal Year, an amount which is equal to the greater of (i) Four Million Five Hundred Thousand and 00/100 Dollars ($4,500,000), or (ii) that amount which is equal to fifteen percent (15%) of 5th Avenue Partners' then current equity investment in the Diegan Project ("Owner's Equity Investment").

- For example, in the event that Owner's Equity Investment is $40,000,000, then Owner's Preferred Returned would be $6,000,000 ($40,000,000 multiplied by .15). In the event Gross Operating Profit for such Fiscal Year is $8,200,000, the Incentive Fee would be $330,000 ($8,200,000 - $6,000,000 multiplied by .15).

- As a further example, in the event Owner's Equity Investment is $20,000,000, then Owner's Preferred Returned would be $4,500,000 because $4,500,000 is greater than $3,000,000 ($20,000,000 multiplied by .15). In the event Gross Operating Profit for such Fiscal Year is $8,2000,000, the Incentive Fee would be $555,000 ($8,200,000 - $4,500,000 multiplied by .15).

EXHIBIT _I_ PAGE _39_

Setai West
May 23, 2007
Page 10

| 14. Beverly Hills Project | **Beverly Hills BMA:** |
|---|---|
| | In connection with the Beverly Hills Project the JV shall enter into a BMA ("Beverly Hills BMA") with an affiliate of SR/TB ("Beverly Hills Owner") on the following terms and conditions: |
| | Beverly Hills Owner shall pay to the JV as consideration for the use of the Brand and the JV's obligations under the Beverly Hills BMA the following ("Beverly Hills Brand Fees"): |
| | • a base fee equal to two percent (2%) of any gross sales proceeds from the sale of each condominium unit at the Beverly Hills Project ("BH Gross Sales Proceeds") up to a break point to be reasonably determined by the parties ("Breakpoint"); plus |
| | • five percent (5%) of any BH Gross Sales Proceeds in excess of the Breakpoint per square foot up to a break point of the Breakpoint + $100 per square foot, which percentage shall increase in equal increments of five percent (5%) each up to fifty percent (50%) for each $100 per square foot over the Breakpoint. |
| | **Beverly Hills HMA:** |
| | Beverly Hills Owner shall pay to the JV the following fees as consideration for the JV's services, in the capacity of "Operator" under the HMA for the Beverly Hills Project (collectively, "Beverly Hills Management Fees"): |
| | (a)  a base fee (the "Beverly Hills Base Fee") equal to five percent (5%) of Gross Operating Revenue for each Fiscal Year; and |
| | (b)  an incentive fee (the "Beverly Hills Incentive Fee") equal to ten percent (10%) of the difference between Gross Operating Profit for each Fiscal Year and the an owner's preferred return, the amount of which shall be mutually agree upon by the parties. |
| 15. Branding Fees and Marketing Fees for Other Projects | The parties hereby agree that the branding fees and the management fees for Projects other than the Diegan Project and the Beverly Hills Project shall be substantially similar to the Beverly Hills Brand Fees and Beverly Hills Management Fees, subject to variations relating to the specific Project as the parties shall mutually agree upon on a Project by Project basis. |
| 16. Governance | SR/TB and Setai would be Co-Managing Members of the JV.  Day to day activities would be delegated to a particular Member, as applicable. |

EXHIBIT _1_ PAGE _40_

Setai West
May 23, 2007
Page 11

| 17. Major Decisions | Major decisions would require both Members' approval and would be agreed to during the Negotiation Period (collectively, "Major Decisions"). |
|---|---|
| 18. Dispute Resolutions | The JV Agreement shall contain mechanisms for dispute resolution and liquidity/exit. In the event of a Deadlock (as defined below), the JV Agreement shall permit either Member at any time to initiate a third-party sales process with a right of first offer in favor of the non-initiating Member. A "Deadlock" would be defined as an unresolved disagreement between the Members concerning a Major Decision. |
| 19. Right of First Offer | In the event of a Deadlock which cannot be resolved through the dispute resolution set forth above, either Member ("Triggering Member") would have the right to cause a sale of all of the interests in the JV or all, or any material portion, of the JV's remaining assets subject to a right of first offer by the other Member ("Non-Triggering Member"). The Non-Triggering Member would have the right to make an offer to purchase the interests or assets (as the case may be) on an "AS IS", "WHERE IS" basis. If the Non-Triggering Member declines to make an offer, the Triggering Member would have the right to sell the interests or assets (as the case may be) to a third-party on behalf of the JV on terms and conditions acceptable to the Triggering Member. If the Non-Triggering Member elects to make an offer, the Triggering Member would have the right to accept the offer or to sell the interests or assets (as the case may be) to a third-party on behalf of the JV for a price greater than the price set forth in the offer by the Non-Triggering Member. Notwithstanding the foregoing, the parties hereby agree that Setai at all times shall have at least fifty one percent (51%) control over the Brand Standards. The terms and conditions of this provision shall be more thoroughly negotiated and shall be set forth in JV Agreement in a form acceptable to each party in its sole discretion. |
| 20. Legal Structure | To be mutually agreed by the Members during the Negotiation Period to maximize tax and operational benefits. Governing law, jurisdiction for disputes and venue would be agreed to during the Negotiation Period. |

WDC 371430640v7 999911.889657

EXHIBIT _1_ PAGE _41_

UNITED STATES
DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

# 146695    — BH
* * C O P Y * *
January 22, 2008
14:48:58

Civ Fil Non-Pris
USAO #.: 08CV0118 CIVIL FILING
Judge..: BARRY T MOSKOWITZ
Amount.:                     $350.00 CK
Check#.: BC# 66074


Total—>  $350.00


FROM: 5TH AVE. PARTNERS V. SETAI GRO
        CIVIL FILING

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**
5TH AVENUE PARTNERS, LLC
STEVE REBEIL
TOM BENJAMIN

**(b)** County of Residence of First Listed Plaintiff    ORANGE
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
JONES DAY, 3 Park Plaza, Suite 1100
Irvine, CA 92614 (949) 851-3939

**DEFENDANTS**
THE SETAI GROUP
JONATHAN BREENE
BY JOHN CONROY

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

Attorneys (If Known)

**08 CV 0118 BTM BLM**

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 442 Employment | **Habeas Corpus:** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of State Statutes |

**V. ORIGIN** (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. 1332
Brief description of cause:
Breach of Contract

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY**
(See instructions):
JUDGE    Judge King
DOCKET NUMBER    07-cv-22948-JLK

DATE    January 22, 2008
SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # 146695    AMOUNT $350    1/22/08 B4    APPLYING IFP    JUDGE    MAG. JUDGE