# EXHIBIT 1

May 23, 2007

Mr. Jonathan Breene
Mr. John Conroy
The Setai Group LLC
The Chrysler Building
405 Lexington Avenue
54th Floor
New York, NY 10174

Re:     Letter of Intent – Setai West

Dear Jonathan and John:

This letter ("Letter") and the term sheet attached hereto as Exhibit A (the "Term Sheet") set forth the basis on which SR/TB Newco, or a subsidiary or affiliate thereof, the principals of which shall be Steve Rebeil and Tom Benjamin ("SR/TB") is willing to enter into negotiations with the intention to agree on the following definitive agreements and such other agreements as may be later determined to be necessary and appropriate (the "Definitive Agreements"): (i) a joint venture agreement (the "JV Agreement") to form a joint venture, limited liability company, partnership or other mutually acceptable form of entity (the "JV"), by the name of "Setai West" or another name mutually agreed upon by the parties, with The Setai Group LLC, a New York limited liability company, or a subsidiary or affiliate thereof ("Setai") for the purpose of developing luxury hotels (individually "Project", collectively, "Projects") on the west coast of the United States of America, in Hawaii and in Mexico (the "Designated Area"), (ii) one or more branding rights agreements, license agreements or similar agreements ("Branding Agreements") to govern the use of the "Setai" brand ("Brand") by the JV in connection with the Projects, (iii) one or more hotel management agreements or similar agreements ("Hotel Management Agreements") to govern the management of the Projects by Setai on behalf of the JV, and (iv) one or more pre-opening and technical services agreements ("Pre-Opening and Technical Services Agreements") to govern the pre-opening services and functions to be performed by Setai in connection with the Projects on behalf of the JV. This Letter and the Term Sheet are referred to collectively herein as this "Letter of Intent."

1.     Binding Letter of Intent and Negotiation.

(a)     Negotiation Period. This Letter of Intent shall be binding on the parties. This Letter of Intent shall remain in effect from the date this Letter is countersigned and delivered by Setai (as set forth below) ("Effective Date") until (i) with respect to the JV Agreement, the execution and delivery of the JV Agreement, (ii) with respect to the Diegan BMA (as defined in Section 2 of the Term Sheet), the execution and delivery of the Diegan BMA, (iii) with respect to the Diegan POTSA (as defined in Section 2 of the Term Sheet), the execution and delivery of the Diegan POTSA, and (iv) with respect to the Diegan HMA (as defined in Section 2 of the Term Sheet), the execution and delivery of the Diegan HMA.

(b)     Negotiation of Definitive Agreements. During that period of time commencing on the Effective Date and expiring ninety (90) days thereafter (the "Negotiation Period"), the parties shall enter negotiations with the intention being to agree on and enter into the following Definitive Agreements listed in order of priority ("Initial Definitive Agreements"), which shall include the terms set forth in the Term Sheet and such other terms as agreed to by the parties that are consistent with this Letter of Intent:

1.     Diegan BMA
2.     Diegan POTSA
3.     JV Agreement
4.     Diegan HMA

EXHIBIT _1_ PAGE _7_

Setai West
May 23, 2007
Page 2

      (c)    Form of Definitive Agreements. As soon as reasonably practical following the execution of this Letter of Intent, SR/TB will provide Setai initial drafts of the Initial Definitive Agreements, incorporating the terms set forth in the Term Sheet.

    2.    Confidentiality.

      (a)    Setai and SR/TB each agree that neither they nor any of their respective officers, directors, affiliates, representatives, or advisors shall make any public announcement with respect to this Letter of Intent or the transactions contemplated hereby, or disclose the terms or existence of this Letter of Intent to any third party (other than to SR/TB's and Setai's respective advisors, representatives, and agents, on a need-to-know basis, for purposes of evaluating and negotiating the transactions contemplated by this Letter of Intent or as may be required by law, in which case, SR/TB and Setai shall consult with each other prior to such disclosure) without the prior written consent of SR/TB or Setai, as applicable. This Paragraph shall survive the termination of this Letter of Intent.

      (b)    Setai and SR/TB shall cooperate to issue press releases in connection with the Diegan Project (as defined in Section 2 of the Term Sheet), the general manager of the Diegan Project, and that certain Project in Beverly Hills, California ("Press Releases") no later than three (3) business days after the Effective Date. SR/TB shall provide a copy of each of the proposed Press Releases to Setai for Setai's approval. Setai shall review such Press Releases within one (1) business day of Setai's receipt of such submission, provided however, if Setai shall fail to approve or reject any such submission within such one (1) business day period, SR/TB may send a second written notice along with a follow up telephone call and an e-mail to Setai. If Setai shall fail to reply within one (1) business day following Setai's receipt of the second notice, Setai's approval shall be deemed to have been given.

    3.    Indemnification.

      (a)    Setai shall indemnify and hold harmless SR/TB and its respective affiliates and their respective shareholders, trustees, partners, members, beneficiaries, directors, officers, managers, security holders, employees, agents and representatives, and the successors and assigns of each of the foregoing (the "SR/TB Indemnified Parties"), for, from and against any liability, damage, loss, cost or expense, including, without limitation, attorneys' fees and court costs, incurred by any of the SR/TB Indemnified Parties in any claim, lawsuit or other legal action or proceeding brought by any third party arising from or relating to the negotiation and execution of this Letter of Intent or the Initial Definitive Agreements. This Paragraph shall survive the termination of this Letter of Intent.

      (b)    SR/TB shall indemnify and hold harmless Setai and its respective affiliates and their respective shareholders, trustees, partners, members, beneficiaries, directors, officers, managers, security holders, employees, agents and representatives, and the successors and assigns of each of the foregoing (the "Setai Indemnified Parties"), for, from and against any liability, damage, loss, cost or expense, including, without limitation, attorneys' fees and court costs, incurred by any of the Setai Indemnified Parties in any claim, lawsuit or other legal action or proceeding brought by any third party to the extent any such claim, lawsuit or other legal action or proceeding results from a breach by SR/TB of any agreement between SR/TB and such third party as a result of the negotiation and execution of this Letter of Intent or the Initial Definitive Agreements. This Paragraph shall survive the termination of this Letter of Intent.

    4.    No Personal Liability. No shareholder, trustee, partner, member, beneficiary, director, officer, manager, security holder, employee, agent, representative or other person acting for or on behalf of Setai or SR/TB shall have any personal liability for any obligations entered into for or on behalf of

EXHIBIT ___1___ PAGE __8__

Setai West
May 23, 2007
Page 3

either such party, and the assets of any such person shall not be subject to any claims or actions relating to any obligations of Setai or SR/TB. This Paragraph shall survive the termination of this Letter of Intent.

5.     Governing Law. This Letter of Intent shall be governed by the laws of the State of California, without giving effect to any principles regarding conflict of laws, but venue of all proceedings relating to this Letter of Intent shall be in the State of California.

6.     Binding Effect. Setai and SR/TB acknowledge and agree that this Letter of Intent shall create a legally binding obligation on the parties to enter into the Initial Definitive Agreements. In addition, the obligations of Setai and SR/TB contained in Paragraphs 1(a), (d), 2, 3, 4, 5 and 6 this Letter of Intent shall be binding and enforceable on them.

If Setai agrees to the terms set forth in this Letter of Intent, please have a duly authorized person countersign this Letter of Intent on behalf of Setai and return it to the undersigned at your earliest convenience.

We look forward to working with you on this transaction.

Sincerely,

5/23/07

Steven Rebeil

5/23/07

Thomas Benjamin

EXHIBIT __I__ PAGE __9__

05/23/2007  14:02    2007279756                    JOHN CONROY                              PAGE  01
05/23/2007  16:39    13056729922                                                           PAGE  05/25

Setai West
May 23, 2007
Page 4

ACKNOWLEDGED, ACCEPTED AND AGREED BY:
THE SETAI GROUP, LLC, a New York limited liability company

By:
Name:  John A Conroy
Title:  Member

Date:  5/23/07

WDC 3714306640v7 999911.389857

EXHIBIT __I__ PAGE _10_

Setai West
May 23, 2007
Page 5

## EXHIBIT A

### JV AGREEMENT
**Term Sheet**

| | |
|---|---|
| **1. Members** | Setai (50% ownership interest in the JV) and SR/TB (50% ownership interest in the JV). |
| **2. Negotiation Period** | During the Negotiation Period:<br>• The parties will prepare the Business Plan and Budget that would set forth the intended development and funding strategy for the JV and for each Project the JV is currently undertaking (the "BP&B"). The BP&B would become the working plan for management and funding of the JV and the Projects. The BP&B would be updated on an annual basis by the Members, or more frequently if required. Any material variances from the approved BP&B would require the approval of both Members.<br>• The parties will prepare the following Initial Definitive Agreements:<br>   o the JV Agreement:<br>   o the Branding Agreement ("Diegan BMA") for that certain 185 unit condominium hotel property located at 1047 5th Avenue in San Diego, California, which shall be known as "Setai San Diego" ("Diegan Project"), which is owned by 5th Avenue Partners, LLC, an affiliate of SR/TB ("5th Avenue Partners");<br>   o the Hotel Management Agreement for the Diegan Project ("Diegan HMA"); and<br>   o the Pre-Opening and Technical Services Agreement for the Diegan Project ("Diegan POTSA"). |
| **3. Fees** | The following fees will be earned by the JV, and through the JV shared equally (50% to Setai and 50% to SR/TB):<br><br>• branding fees pursuant to the Branding Agreements (but specifically excluding sales commissions earned for the sale of condominium units in the Diegan Project for which as of the earlier to occur (i) the commencement date of the JV Agreement, or (ii) the commencement date of the Diegan BMA, a contract of purchase and sale ("Existing Contract") has been signed by a purchaser (such condominium units being referred to as "Sold Units"). All other condominium units in the Diegan Project shall be referred to as "Available Units";<br>• hotel management fees and incentive fees pursuant to the Hotel Management Agreements;<br>• technical services fees pursuant to the Technical Services Agreements; and<br>• development fees (excluding development fees for the Diegan Project which will be retained by 5th Avenue Partners).<br><br>Notwithstanding the foregoing, in the event that a third party brings a project to Setai which requires only branding and management, Setai shall receive one hundred percent (100%) of the branding fees. The hotel management fees (including incentive fees) and the technical services fees shall be shared equally |

*WDC 371430640v7 999911.889657*

EXHIBIT ___1___ PAGE 11

Setai West
May 23, 2007
Page 6

| | |
|---|---|
| | through the JV (50% to Setai and 50% to SR/TB). |
| **4. Designated Area** | The JV will have the exclusive right to sell, market, develop or operate properties using the Brand within the west coast of the United States of America (as more specifically defined in the JV Agreement), in Hawaii and in Mexico (the "Designated Area"). Setai agrees that neither Setai, nor any of its affiliates or other related entities or persons, nor any shareholder, trustee, partner, member, director, officer, manager, employee, agent or representative, or any person acting for or on behalf of any of the foregoing persons or entities, shall be permitted to solicit, pursue, negotiate, work or consult with any other party with respect to hotel projects or any other resort development in the Designated Area, other than the Current Proposed Projects (as defined in this Section 4). <br><br> The parties acknowledge that Setai is currently in negotiations with third parties in connection with hotel projects in Palm Desert, Napa Valley, Cabos, Puerto Vallarta, Punta Mita, and Sayulita ("Current Proposed Projects"). In the event that Setai determines, in its sole discretion, to pursue any or all of the Current Proposed Projects ("Accepted Current Proposed Projects"), such Accepted Current Proposed Project shall become a project of the JV, be included in the definition of "Projects" in the JV Agreement, and thereafter proceed as a Project of the JV subject to terms and conditions substantially identical (but subject to variations relating to local law and the specific Project) to those terms and conditions of any other JV Project (as defined in Section 12 of this Term Sheet). |
| **5. Governing Board** | The Members shall formulate a governing board or committee ("Governing Board") containing at least three (3) members, comprised of (i) one representative of Setai, (ii) one representative of SR/TB, and (iii) one member mutually agreed upon by the parties. The sole purpose of the Governing Board shall be to review, analyze and accept or reject proposed Projects within the Designated Area ("Proposed Projects"). <br><br> If a Proposed Project is presented to the Governing Board, the Governing Board shall approve or reject, with an explanation of the reasons for rejection, any such submission within ten (10) business days after receipt of a written submission of the Proposed Project. A Proposed Project which is accepted by the Governing Board shall be initially evidenced by a binding letter of intent in connection with the Proposed Project, and the negotiation of the Definitive Agreements in connection with the Proposed Project shall commence promptly thereafter. |
| **6. Proposal of Projects Outside of the Designated Area** | SR/TB shall have the right and option to (i) enter into mutually acceptable binding agreements with Setai for transactions to license the Brand outside of the Designated Area, and (ii) match, with a comparable opportunity (as determined by Setai in its sole discretion), any other project presented to Setai by any other party outside of the Designated Area. Such projects shall be referred to individually as a "Outside Proposed Project". <br><br> If an Outside Proposed Project is presented to Setai, Setai shall approve or reject, with an explanation of the reasons for rejection, any such submission within fifteen (15) business days after receipt of a written proposal for such Outside Proposed Project. An Outside Proposed Project which is accepted by Setai ("Accepted Project"), shall be evidenced by a binding letter of intent in |

*WDC 371430640v7 999911.889657*

EXHIBIT _I_  PAGE 12

Setai West
May 23, 2007
Page 7

| | |
|---|---|
| | connection with the Accepted Project, and the Accepted Project shall become a project of the JV, shall be included in the definition of "Projects" in the JV Agreement, and thereafter proceed as a Project of the JV subject to terms and conditions substantially identical (but subject to variations relating to local law and the specific Project) to those terms and conditions of any other JV Project (as defined in Section 12 of this Term Sheet). |
| **7. Current Outside Projects** | SR/TB acknowledges that Setai is currently involved in projects with the Brand in New York City, the Bahamas, and Costa Rica ("Current Outside Projects"). The JV shall have the right to purchase fifty percent (50%) of Setai's interest in the branding fees, hotel management fees, technical services fees, development fees, marketing fees, sales commissions (including new and re-sale), and any other fees related to the Current Outside Projects. SR/TB and Setai acknowledge that they intend to negotiate, diligently and in good faith, the terms and conditions for the exercise of the purchase right set forth in this Section 7, including, by way of example only and not as a limitation (i) the duration of the purchase right, (ii) the manner of exercise of the purchase right, and (iii) the methodology for the valuation of the interest to be acquired by SR/TB. |
| **8. Brand Standards** | The parties acknowledge that it is critical that Setai control the standards governing the Brand ("Brand Standards"). Therefore, Setai shall have fifty one percent (51%) voting rights and control over all decisions regarding the Brand Standards. |
| **9. Setai Fund I** | SR/TB shall create an equity fund for the purpose of developing the Projects, including Accepted Projects, Accepted Current Proposed Projects, if any, and Current Outside Projects, if any ("Setai Fund I"). SR/TB shall own and manage Setai Fund I and shall have sole responsibility for creating and maintaining Setai Fund I. Setai Fund I shall be separate and apart from the JV. A representative of Setai shall hold a position on the board of directors of the Setai Fund I.<br><br>Any third party financing of Setai Fund I shall be non-recourse to the Members (other than standard non-recourse carve-outs for "bad boy" acts, and environmental indemnities if required). The Members intend to use a prudent amount of debt under commercially reasonable financing conditions to finance the Projects. |
| **10. Responsibilities** | The parties acknowledge that each party has unique and specialized skills to contribute to the JV.<br>• SR/TB shall contribute its expertise in hotel development.<br>• SR/TB shall contribute its ability to raise capital for the Projects through Setai Fund I.<br>• SR/TB shall contribute the following Projects:<br>  • to Diegan Project;<br>  • that certain project located at 8484 Wilshire Boulevard, Beverly Hills, California, which shall be known as "Setai Beverly Hills" ("Beverly Hills Project"); and |

EXHIBIT ___1___ PAGE 13

Setai West
May 23, 2007
Page 8

|  | • that certain project site located in San Francisco, California.<br>• Setai shall contribute the Brand and its expertise in design and management of luxury hotels.<br><br>All of the foregoing shall be more specifically set forth in the JV Agreement. |
|---|---|
| **11. Member Investment Rights** | Except for Current Outside Projects, each of SR/TB and Setai shall have the right to invest equity on a para passu basis for any Project, including Accepted Projects. |
| **12. Sale or Initial Public Offering of Setai Worldwide Brand** | In the event that the Setai Worldwide Brand is sold or is the subject of an initial public offering ("Setai Sale"), the Projects, Accepted Projects, the Current Outside Projects and Accepted Current Proposed Projects (collectively, "JV Projects"), shall receive a pro rata value on any such Setai Sale. The calculation of the JV's interest in the Setai Sale shall be based on a straight proportion of (i) the total gross revenue generated by the JV Projects, and (ii) the total corporate revenue created by the Setai Worldwide Brand. |
| **13. Diegan Project** | The Diegan Project is scheduled to be completed by December 2007. The JV shall receive no development fees for the Diegan Project and the Diegan Project will continue to be owned by 5th Avenue Partners.<br><br>Diegan BMA:<br><br>In connection with the Diegan Project the JV shall enter into a the Diegan BMA with 5th Avenue Partners on the following terms and conditions:<br><br>5th Avenue Partners shall pay to the JV as consideration for the use of the Brand and the JV's obligations under the Diegan BMA the following ("Brand Fees"):<br>• a base fee equal to two percent (2%) of any gross sales proceeds from the sale of each Available Unit ("Gross Sales Proceeds") up to a break point of $1,383 per square foot; **plus**<br>• five percent (5%) of any Gross Sales Proceeds in excess of $1,383 per square foot up to a break point of $1,483 per square foot; plus<br>• ten percent (10%) of any Gross Sales Proceeds in excess of $1,483 per square foot up to a break point of $1,583 per square foot; plus<br>• fifteen percent (15%) of any Gross Sales Proceeds in excess of $1,583 per square foot up to a break point of $1,683 per square foot; plus<br>• twenty percent (20%) of any Gross Sales Proceeds in excess of $1,683 per square foot up to a break point of $1,783 per square foot; plus<br>• twenty-five percent (25%) of any Gross Sales Proceeds in excess of $1,783 per square foot up to a break point of $1,883 per square foot; plus<br>• thirty percent (30%) of any Gross Sales Proceeds in excess of $1,883 per square foot up to a break point of $1,983 per square foot; plus<br>• thirty-five percent (35%) of any Gross Sales Proceeds in excess of $1,983, up to a break point of $2,083 per square foot; plus<br>• forty percent (40%) of any Gross Sales Proceeds in excess of $2,083 per square foot up to a break point of $2,183 per square foot; plus<br>• forty-five percent (45%) of any Gross Sales Proceeds in excess of |

EXHIBIT 1    PAGE 14

Setai West
May 23, 2007
Page 9

$2,183 up to a break point of $2,283 per square foot; plus

- fifty percent (50%) of any Gross Sales Proceeds in excess of $2,283 per square foot.

Setai expressly acknowledges that 5th Avenue Partners shall have no obligation to pay to the JV any Brand Fees or sales commissions in connection with Sold Units or Existing Contracts.

Diegan HMA:

5th Avenue Partners shall pay to the JV the following fees as consideration for the JV's services, in the capacity of "Operator" under the Diegan HMA (collectively, "Management Fees"):

(a)     a base fee (the "Base Fee") equal to four percent (4%) of Gross Operating Revenue (as defined pursuant those accounting principles, conventions, rules, procedures, and practices, consistently applied, affecting all aspects of recording and reporting financial transactions which are generally accepted and applied to the hospitality industry by major international independent accounting firms, and as more particularly defined in the Diegan HMA ("HMA Definition")) for each fiscal year of the term of the HMA ("Fiscal Year"); and

(b)     an incentive fee (the "Incentive Fee") equal to fifteen percent (15%) of the difference between Gross Operating Profit (as defined in the HMA Definition) for each Fiscal Year and the Owner's Preferred Return (hereinafter defined).

"Owner's Preferred Return" shall be applicable solely to the calculation of the Incentive Fee and shall mean, with respect to each Fiscal Year, an amount which is equal to the greater of (i) Four Million Five Hundred Thousand and 00/100 Dollars ($4,500,000), or (ii) that amount which is equal to fifteen percent (15%) of 5th Avenue Partners' then current equity investment in the Diegan Project ("Owner's Equity Investment").

- For example, in the event that Owner's Equity Investment is $40,000,000, then Owner's Preferred Returned would be $6,000,000 ($40,000,000 multiplied by .15). In the event Gross Operating Profit for such Fiscal Year is $8,200,000, the Incentive Fee would be $330,000 ($8,200,000 - $6,000,000 multiplied by .15).

- As a further example, in the event Owner's Equity Investment is $20,000,000, then Owner's Preferred Returned would be $4,500,000 because $4,500,000 is greater than $3,000,000 ($20,000,000 multiplied by .15). In the event Gross Operating Profit for such Fiscal Year is $8,2000,000, the Incentive Fee would be $555,000 ($8,200,000 - $4,500,000 multiplied by .15).

EXHIBIT  1  PAGE 15

Setai West
May 23, 2007
Page 10

| 14. Beverly Hills Project | **Beverly Hills BMA:**<br><br>In connection with the Beverly Hills Project the JV shall enter into a BMA ("Beverly Hills BMA") with an affiliate of SR/TB ("Beverly Hills Owner") on the following terms and conditions:<br><br>Beverly Hills Owner shall pay to the JV as consideration for the use of the Brand and the JV's obligations under the Beverly Hills BMA the following ("Beverly Hills Brand Fees"):<br>• a base fee equal to two percent (2%) of any gross sales proceeds from the sale of each condominium unit at the Beverly Hills Project ("BH Gross Sales Proceeds") up to a break point to be reasonably determined by the parties ("Breakpoint"); plus<br>• five percent (5%) of any BH Gross Sales Proceeds in excess of the Breakpoint per square foot up to a break point of the Breakpoint + $100 per square foot, which percentage shall increase in equal increments of five percent (5%) each up to fifty percent (50%) for each $100 per square foot over the Breakpoint. |
| | **Beverly Hills HMA:**<br><br>Beverly Hills Owner shall pay to the JV the following fees as consideration for the JV's services, in the capacity of "Operator" under the HMA for the Beverly Hills Project (collectively, "Beverly Hills Management Fees"):<br><br>(a)  a base fee (the "Beverly Hills Base Fee") equal to five percent (5%) of Gross Operating Revenue for each Fiscal Year; and<br><br>(b)  an incentive fee (the "Beverly Hills Incentive Fee") equal to ten percent (10%) of the difference between Gross Operating Profit for each Fiscal Year and the an owner's preferred return, the amount of which shall be mutually agree upon by the parties. |
| 15. Branding Fees and Marketing Fees for Other Projects | The parties hereby agree that the branding fees and the management fees for Projects other than the Diegan Project and the Beverly Hills Project shall be substantially similar to the Beverly Hills Brand Fees and Beverly Hills Management Fees, subject to variations relating to the specific Project as the parties shall mutually agree upon on a Project by Project basis. |
| 16. Governance | SR/TB and Setai would be Co-Managing Members of the JV.  Day to day activities would be delegated to a particular Member, as applicable. |

EXHIBIT  1  PAGE 16

Setai West
May 23, 2007
Page 11

| 17. Major Decisions | Major decisions would require both Members' approval and would be agreed to during the Negotiation Period (collectively, "Major Decisions"). |
| --- | --- |
| 18. Dispute Resolutions | The JV Agreement shall contain mechanisms for dispute resolution and liquidity/exit. In the event of a Deadlock (as defined below), the JV Agreement shall permit either Member at any time to initiate a third-party sales process with a right of first offer in favor of the non-initiating Member. A "Deadlock" would be defined as an unresolved disagreement between the Members concerning a Major Decision. |
| 19. Right of First Offer | In the event of a Deadlock which cannot be resolved through the dispute resolution set forth above, either Member ("Triggering Member") would have the right to cause a sale of all of the interests in the JV or all, or any material portion, of the JV's remaining assets subject to a right of first offer by the other Member ("Non-Triggering Member"). The Non-Triggering Member would have the right to make an offer to purchase the interests or assets (as the case may be) on an "AS IS", "WHERE IS" basis. If the Non-Triggering Member declines to make an offer, the Triggering Member would have the right to sell the interests or assets (as the case may be) to a third-party on behalf of the JV on terms and conditions acceptable to the Triggering Member. If the Non-Triggering Member elects to make an offer, the Triggering Member would have the right to accept the offer or to sell the interests or assets (as the case may be) to a third-party on behalf of the JV for a price greater than the price set forth in the offer by the Non-Triggering Member. Notwithstanding the foregoing, the parties hereby agree that Setai at all times shall have at least fifty one percent (51%) control over the Brand Standards. The terms and conditions of this provision shall be more thoroughly negotiated and shall be set forth in JV Agreement in a form acceptable to each party in its sole discretion. |
| 20. Legal Structure | To be mutually agreed by the Members during the Negotiation Period to maximize tax and operational benefits. Governing law, jurisdiction for disputes and venue would be agreed to during the Negotiation Period. |

EXHIBIT __1__ PAGE __17__